UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------------X

REMBRANDT 3D HOLDING, LTD.,

                             Plaintiff,

        -against-

STREAM TV NETWORK, INC., RAJA
RAJAN, MATHAU RAJAN, WALTER
ROELEN, BART BARENBRUG, PETER
ROELEN, and HANS ZUIDEMA,

                        Defendants.

-----------------------------------------------------------------X

**USDC SDNY**
**DOCUMENT**
**ELECTRONICALLY FILED**
**DOC #:** _____
**DATE FILED:** ___11/04/2020___

**REPORT & RECOMMENDATION
ON PLAINTIFF'S MOTION TO
ENFORCE SETTLEMENT TERM
SHEET**

**17-CV-882 (RA) (KHP)**

**TO:    THE HONORABLE RONNIE ABRAMS, UNITED STATES DISTRICT JUDGE**
**FROM:  THE HONORABLE KATHARINE H. PARKER, UNITED STATES MAGISTRATE JUDGE**

       Plaintiff Rembrandt 3D Holding, Ltd. ("Rembrandt") brings this suit against Stream TV

Network, Inc., Raja Rajan, Mathau Rajan, Walter Roelen, Bart Barenbrug, Peter Roelen, and

Hans Zuidema (collectively, "Defendants").  Plaintiff Rembrandt includes three patent

infringement claims in its Amended Complaint (ECF No. 26), along with claims for breach of

contract, promissory estoppel, and unjust enrichment, all stemming from events surrounding

the glasses-free three-dimension television industry.  The Hon. Ronnie Abrams granted

Defendants motion to dismiss with respect to the three patent claims and reserved judgment as

to the remaining state law claims.  (ECF No. 47.)  Currently at issue in this Report is Plaintiff's

motion to enforce a term sheet entered into by the parties during a settlement conference

before the Court.  Defendants oppose the motion arguing that no final settlement agreement

has yet been reached, and as such, there is nothing to enforce.  For the reasons that follow, I

respectfully recommend that Plaintiff's motion be denied.

**RELEVANT FACTUAL BACKGROUND & PROCEDURAL HISTORY**

Plaintiff Rembrandt is the successor-in-interest to 3DFusion Corp., the original owner of

the relevant glasses-free three-dimensional TV technology (Philip's 3DASD).  In February 2016,

Stephen Blumenthal, the then-Director of Rembrandt, acquired all of the assets of 3DFusion.  In

December 2016, Mr. Blumenthal assigned all of 3DFusion's assets to Rembrandt.  Plaintiff

Rembrandt then filed its complaint in New York State Supreme Court on January 6, 2017.[1]

Defendants removed the state action to this Court on the basis of diversity jurisdiction and

moved to dismiss the lawsuit for lack of jurisdiction.  (ECF Nos. 8, 13-15.)  Plaintiff subsequently

moved to amend its complaint, without opposition from Defendants, which the Court granted

on June 20, 2017 while also terminating Defendants' motion to dismiss for lack of jurisdiction as

moot.  (ECF No. 25.)  Plaintiff served the Amended Complaint on Defendants on June 23, 2017.

Defendants, in turn, filed a motion to dismiss the Amended Complaint on July 21, 2017,

premised on insufficient service of process and a failure to state a claim upon which relief could

be granted.  (ECF No. 29-31.)  The Court held a hearing on May 11, 2018 in which the parties

agreed to mediation by a magistrate judge, ultimately resulting in a referral to the undersigned

for settlement purposes.  (ECF No. 54.)  Subsequently, the Court held a settlement conference,

in person with counsel, on July 18, 2018.

From that time, until the second settlement conference held on April 9, 2019, the

parties communicated, electronically and occasionally in person, over the settlement terms.  In

advance of the second settlement conference, on March 26, 2019, Neal Kronley (then-counsel

---

[1] The original complaint filed in New York State Supreme Court was never provided on the record of this federal
litigation.

for Defendants) emailed Plaintiff's counsel notifying him that Defendants would be attending, and that Mr. Kronley had authority to settle all claims against all parties, and was "not interested in a piecemeal resolution of the dispute." (ECF No. 90-2.) Also, on April 2, 2019, Mr. Kronley sent another email to Plaintiff's counsel with a redlined term sheet, incorporating the last round of his clients' comments. (ECF No. 90-3.)

Prior to the commencement of the second settlement conference on April 9, 2019, all parties signed the Court's Settlement Conference Agreement. (ECF No. 90-4.) This agreement commits the parties to, among other items, being bound by "any written settlement agreement, memorandum of understanding or settlement memorialized on the record . . . ." (*Id.*) The parties then spent the day negotiating the terms of a settlement, using the term sheet provided by Mr. Kronley on April 2 as the basis of the negotiations. However, the way in which the parties view the outcome from the second settlement conference, and the objective intent attributed to the term sheet, differs greatly. According to Plaintiff:

> By late afternoon, after the parties reached mutual agreement to the various negotiated changes to the [term sheet], Mr. Kronley made hand-written agreed modifications thereto; the parties, with Mr. Stastney representing the Defendants and Mr. Blumenthal representing Plaintiff, then indicated assent by mutually initialing the modified [term sheet]; Magistrate Judge Parker was notified of the parties' agreement, who then affixed her signature thereto. [(ECF No. 90-5.)] Mr. Kronley agreed to draft the final documentation referenced in the [term sheet].

(ECF No. 90 at 5.) According to Defendants:

> On April 9, 2019 the parties attended a second mediation conference. At the conference a non-binding [term sheet] memorializing the progress of the parties' negotiations was initialed by Defendants' attorney. Thereafter, the parties continued settlement discussions.

(ECF No. 92 at 3.)  Regardless of the differing views, the parties do not dispute that on April 10,

2019, as agreed to during the conference, Mr. Kronley emailed (ECF No. 90-6) Plaintiff's counsel

a copy of the term sheet (ECF No. 90-5, hereinafter, "Settlement Term Sheet") as negotiated

between the parties during the second settlement conference—it is this Settlement Term Sheet

that Plaintiff seeks to enforce.  The Settlement Term Sheet consists of four-pages containing

fifteen separate clauses (and handwritten notes), a signature page, a schedule related to

intellectual property, and an appended piece of loose-leaf paper containing two headers that

read "Representations and Warranties" and "Next Steps."  All of these pages (with the non-

consequential exception of the signature page) are initialed by opposing counsels, with the

Court affixing its signature to the final page of the document (the loose-leaf page).  (ECF No. 90-

5.)  The Settlement Term Sheet contemplated the future execution of no fewer than five

separate documents:  a long-form settlement agreement, a Warrant Agreement, a Market

Development Agreement, a Side Letter, and a Supply Agreement.  On May 3, 2019, Mr. Kronley

emailed Plaintiff's counsel (ECF No. 90-7), this time attaching the Warrant Agreement (ECF No.

90-8), which, according to Plaintiff, "completed all material terms of the Settlement Term

Sheet."  (ECF No. 90 at 5.)  On June 13, 2019, Defendants emailed Plaintiff a draft of the long-

form settlement agreement, but according to Plaintiff, the terms of that draft differed greatly

from the Settlement Term Sheet's terms, which led to Plaintiff's rejection of the draft

agreement, via email, on June 17, 2019.  (ECF No. 90-10.)  However, in that same email,

Plaintiff's counsel accepted the Warrant Agreement and returned a countersigned copy.  (*Id.*)

On July 8, 2019, the parties met in-person in an attempt to resolve this litigation.  There,

Shad Stastney, counsel for Defendant Stream TV, notified Plaintiff that his client had

encountered financial difficulties, but that nonetheless, it was still committed to the net present value of the Settlement Term Sheet.  Later that month, on July 23, 2019, Mr. Kronley sent Plaintiffs an email containing the five above-mentioned ancillary documents, but as indicated by the email itself, only the Supply Agreement was being sent to Plaintiffs for the first time.  (ECF No. 90-12.)  Mr. Kronley also noted in this email, in the hopes that this understanding was mutual, that while the other documents would be finalized and executed, the long-form settlement agreement was to be finalized but left unexecuted until "the timing and allocation of payments and product" to be determined later.  (ECF No. 90-12.)  Finally, Mr. Kronley noted that Defendants remained committed to the "net present value of the deal discussed" at the second settlement conference and "memorialized in the ***non-binding term sheet***."  (ECF No. 90-12 (emphasis added).)  According to Plaintiffs, the Supply Agreement received on July 23 contained terms that significantly deviated from the Settlement Term Sheet's terms.

On August 19, 2019, Mr. Kronley sent an email to all counsel, as well as to the Court, reporting on the Defendants' current financial woes, restating Defendants' commitment to the "net present value of the ***non-binding [Settlement] Term Sheet***, but also providing substantial edits and changes to the pre-existing documents, including the Market Development Agreement and the Supply Agreement.  (ECF No. 15 (emphasis added).)  Then on September 18, 2019, according to Plaintiff, Mr. Kronley emailed Plaintiff's counsel three brand new documents—a Memorandum of Understanding (ECF No. 90-16), a Tolling Agreement, and a Stipulation of Dismissal Without Prejudice—and apparently removed all references to the previously stated commitment by Defendants to the net present value reflected in the

Settlement Term Sheet.  Plaintiff objected to the Memorandum of Understanding, and

negotiations broke down shortly thereafter.

Over the next several months, Mr. Blumenthal, on behalf of Plaintiff, had some

communications with certain individuals who were associated with Defendants at the time

communications broke down, as well as with Defendant Mathu Rajan.  Mathu Rajan, on

February 16, 2020, made another offer to Plaintiff settle this matter that, according to Plaintiff,

continued to materially differ from the Settlement Term Sheet's terms.  (ECF No. 20.)

In April 2020, Plaintiff moved to enforce the Settlement Term Sheet.  (ECF Nos. 90, 91.)

Defendants oppose Plaintiff's motion, arguing that the Settlement Term Sheet is not

enforceable and that the parties have not otherwise reached an enforceable agreement to

resolve this litigation.

## LEGAL STANDARDS

It goes without saying that in order for a court to enforce a settlement agreement, there

must first be an agreement.  A settlement agreement is simply a specific type of contract.  *See*

*Torres v. Walker*, 356 F.3d 238, 245 (2d Cir. 2004).  "A federal trial court sitting in diversity

jurisdiction must apply the law of the forum state to determine the choice-of-law."  *Fieger v.*

*Pitney Bowes Credit Corp.*, 251 F.3d 386, 393 (2d Cir. 2001) (citing *Klaxon Co. v. Stentor Electric*

*Mfg. Co.*, 313 U.S. 487, 497 (1941)).  "In New York, the forum state in this case, the first

question to resolve in determining whether to undertake a choice of law analysis is whether

there is an actual conflict of laws." *Id.* (citing *Matter of Allstate Ins. Co. & Stolarz*, 81 N.Y.2d 219

(1993)).  "It is only when it can be said that there is no actual conflict that New York will

dispense with a choice of law analysis." *Id.* As discussed below, the laws of New York apply to this case.

Under the laws of New York, courts determine if a valid, binding, and enforceable contract is formed by looking at "the 'objective manifestations of the intent of the parties as gathered by their expressed words and deeds.'" *Stonehill Capital Mgmt., LLC v. Bank of the W.*, 28 N.Y.3d 439, 448-49 (2016) (quoting *Brown Bros. Elec. Contrs. v Beam Constr. Corp.*, 41 N.Y.2d. 397, 399 (1977)). "[D]isproportionate emphasis is not to be put on any single act, phrase or other expression, but, instead, on the totality of all of these, given the attendant circumstances, the situation of the parties, and the objectives they were striving to attain." *Id.* at 449 (citing *Brown Bros.*, 41 N.Y.2d at 399-400). However, parties to a "preliminary agreement" may sometimes be able to enforce the terms of that agreement even if the agreement falls short of being an enforceable contract. *See Brown v. Cara*, 420 F.3d 148, 153 (2d Cir. 2005). The party moving to enforce a settlement agreement bears the burden of proving that the agreement at issue is binding and enforceable. *See Grgurev v. Licul*, No. 1:15-cv-9805 (GHW), 2016 WL 6652741, at *3 (S.D.N.Y. Nov. 10, 2016). New York Courts recognize two types of preliminary agreements. *See Adjustrite Systems v. GAB Business Services*, 145 F. 3d 543, 547-49 (2d Cir. 1998). The first type, or Type I, is a preliminary agreement that binds the parties to the ultimate terms intended by the parties' agreement. *Id.* at 548. In other words, it is effectively the same as a contract and its terms are enforceable against all parties who have shown an objective manifestation of an intent to be bound by the terms of the preliminary agreement. The second type, or Type II, is a preliminary agreement that does not bind the parties to the ultimate terms, but only confers upon the parties a duty to continue

negotiating in good faith until the agreement is reduced to a contract or mutually ended. *Id.*

Thus, a Type II preliminary agreement is not enforceable on its own terms, but may give rise to

damages in the form of a breach of the contractual duty to continue negotiating in good faith.

## DISCUSSION

Plaintiff has found itself in a position where it has memorialized the terms of a potential

deal with its counter-party, yet, may be in the unenvious position of being unable to enforce

those terms.  Plaintiff first argues that the Settlement Term Sheet is an enforceable contract

under the laws of New York.  Alternatively, Plaintiff argues that if the Settlement Term Sheet is

not a contract, then it is either a Type I enforceable and binding preliminary agreement that

commits Defendants to the terms of the sheet or Type II preliminary agreement giving rise to a

duty to continue negotiating in good faith.  Defendants oppose Plaintiff at every turn, arguing

that the Settlement Term Sheet is not enforceable in any way as it was still subject to significant

negotiation.

Before reaching the substantive issues, a word about the controlling law in this case is

necessary.  Paragraph 3 of the Settlement Term Sheet provides that the "Term Sheet and the

terms for this transaction shall be governed by the laws of Delaware exclusively, and the Parties

shall submit to that jurisdiction."  (ECF No. 90-5.)  The above-discussed legal standards

regarding when New York law applies choice-of-law provisions presume that there is in fact a

contract.  However, when the existence of a contract is at issue—and as discussed below, there

is no contract—it cannot be said that there is an enforceable choice-of-law provision at all.

Thus, this Court is not bound by the parties' decision to elect Delaware law in the Settlement

Term Sheet, as that document is not a contract formed pursuant to offer, acceptance, and

consideration—the parties seemingly acknowledge this reality by grounding the vast majority of their arguments in New York law, although both parties do cite to Delaware. Even if the Court were obligated to undergo a choice-of-law analysis, New York law allows courts to dispense of such analysis if there is no actual conflict in the laws to be applied. Here, Delaware courts have adopted the federal courts' interpretation of New York law with respect to the enforceability of preliminary agreements. *See Siga Techs., Inc. v. PharmAthene, Inc.*, 132 A.3d 1108, 1142 (Del. 2015), as corrected (Dec. 28, 2015) ("This Court first applied New York's bifurcated approach to preliminary agreements in SIGA I[, 67 A.3d 330, 349-51 (Del. 2013)].").  As such, this Report will apply New York law.

I will now consider each of Plaintiff's three arguments for enforceability. For the reasons that follow, I recommend holding the Settlement Term Sheet to be a Type II preliminary agreement that is neither a contract nor a Type I preliminary agreement, and thus, its terms are not enforceable against Defendants.

### I.        Is the Settlement Term Sheet a Contract?

While Plaintiff focuses most of their argument on whether or not the Settlement Term Sheet is a Type I preliminary agreement, Plaintiff does argue that the Settlement Term Sheet is a contract in its own right that should be enforceable against Defendant's. Plaintiff first argues that Mr. Kronley's April 10, 2019 email, sending a copy of the Settlement Term Sheet as discussed during the prior day's settlement conference, which was initialled by authorized agents for parties from both sides, created a contract. This is so, Plaintiff argues, because under N.Y. G.O.B. § 5-701(b)(3)(a) & (d), and under N.Y. U.C.C. §§ 2-201(2) & 2-202, the initialing of the Settlement Term Sheet and its reversion by Mr. Kronley to Plaintiff created a

signed writing that is a contract for the sale of goods.  This argument is not persuasive.  The three basic components to the formation of any contract are offer, acceptance, and consideration.  *See Teachers Ins. & Annuity Ass'n of Am. v. Tribune Co.*, 670 F. Supp. 491, 497 (S.D.N.Y. 1987) ("Ordinarily in contract negotiation, enforceable legal rights do not arise until either the expression of mutual consent to be bound, or some equivalent event that marks acceptance of offer.").  One cannot accept an offer to enter into a contract that was not made—to use the seminal phrase, there must be a "meeting of the minds" between the parties before a contract is formed.  Mr. Kronley's April 10 email was not an unconditional offer that Plaintiff could accept.  The email Plaintiff claims to be an offer contained a single sentence: "Please find attached a copy of the term sheet that was initialed yesterday."  (ECF No. 90-6.) This is not the language of an offer, and the fact that this term sheet contained terms for the sale of goods that, if formed into a contract, may be controlled by N.Y. U.C.C., does not transform it into a contract.  And there is no other evidence that Mr. Kronley's delivery of the Settlement Term Sheet was otherwise accompanied by conduct that could be viewed as an offer to Plaintiff.

Thus, the Settlement Term Sheet is not an enforceable contract for the settlement of this litigation or for the sale of goods.

## II.    Is the Settlement Term Sheet an Enforceable Preliminary Agreement?

New York recognizes that parties may sometimes create preliminary agreements that create contractual obligations.  The question presented here, having determined that the Settlement Term Sheet is not a contract, is whether the Settlement Term Sheet is a Type I or II preliminary agreement, or nothing at all.

a. _Type I Preliminary Agreements_

In considering whether a Type I preliminary agreement has been created, courts

applying New York law consider the following four factors:

(1) whether there is an expressed reservation of the right not to be bound in the absence of a writing;
(2) whether there has been partial performance of the contract;
(3) whether all of the terms of the alleged contract have been agreed upon; and
(4) whether the agreement at issue is the type of contract that is usually committed to writing.

_Brown_, 420 F.3d at 154 (citing _Adjustrite_, 145 F.3d at 549).  The first factor—the explicit and

objective language of the agreement—"is the most important."  _Adjustrite_, 145 F.3d at 549

(quoting _Arcadian Phosphates, Inc. v. Arcadian Corp._, 884 F.2d 69, 72 (2d Cir.1989)).  In

_Adjustrite_, the agreement at issue did not contain an explicit statement, one way or the other,

as to the parties' intent to be bound by the agreement.  _Id._ at 549-50.  However, in finding that

this factor weighed against a Type I agreement, the court noted that the agreement had been

made partially contingent "upon the execution of a sales agreement contract" and employment

contracts.  _Id._ at 550.  Similarly, in _Brown_, the agreement did not contain an explicit reference

as to the parties' intent to be bound, and the fact that the agreement contemplated "enter[ing]

into a formal contract" counseled against finding a Type I agreement.  420 F.3d at 151.  The

Settlement Term Sheet is analogous to both _Adjustrite_ and _Brown_ in the sense that it explicitly

contemplated the execution of a long-form agreement as well as several ancillary documents.

This counsels against a Type I finding.  However, unlike _Adjustrite_ and _Brown_, the Settlement

Term Sheet does contain explicit and objective manifestations regarding the parties' intent _not_

_to be bound_ by the Settlement Term Sheet:  twice on the first page of the Settlement Term

Sheet, the phrase "non-binding" appears immediately adjacent to a reference to the term

sheet—and one of those references is bolded.  (ECF No. 90-5.)  The parties could not have

shown their objective manifestations of their intent not to be bound by the Settlement Term

Sheet more clearly.  To avoid this reality, Plaintiff argues that the Settlement Conference

Agreement entered into by both parties on April 9, 2019 before beginning the second

settlement conference binds them to the Settlement Term Sheet.  That is because, Plaintiff

argues, Paragraph 6 of that agreement provides that "any written settlement agreement,

memorandum of understanding or settlement memorialized on the record is . . . binding,

enforceable, and admissible . . . to enforce the settlement agreement."  (ECF No. 90-4.)  This is

incorrect.  The Court's pre-settlement agreement provides for enforceability of an agreement if

it is made part of the public record.  In this case, the provisions of the term sheet were not

made part of the public record because the parties were not done negotiating.  The parties did

reach agreement on the initialed provisions, but they were subject to additional conditions

before becoming binding.  These additional conditions included creation of other ancillary

agreements and formalization of the agreement.  For this reason, the agreement was not final

and was non-binding, as reflected in the term sheet.  The fact that Mr. Kronley provided

Plaintiff with a term sheet on April 2 in advance of the second settlement conference,

containing the two "non-binding" phrases, is immaterial—the parties chose to reaffirm that

language when they initialed the Settlement Term Sheet.  If the parties intended the term sheet

to be the complete binding agreement, they would have stricken the two "non-binding"

phrases from the Settlement Term Sheet.  Thus, this first and most important factor weighs

against a finding of a Type I agreement.

The second factor asks whether there has been partial performance by any party.  No performance, partial or otherwise, has been made.  While partial performance by any party will often be looked at as favoring a Type I finding, the absence of any partial performance is not dispositive against a Type I finding.  *HDtracks.com, LLC v. 7digital Grp. PLC*, No. 18-cv-5823 (JFK), 2019 WL 6170838, at *9 (S.D.N.Y. Nov. 19, 2019) ("Partial performance by a party signals the existence of an implied contract, but this fact alone does not establish an express contract.").  Here, no party attempted to perform any obligations under the agreement.  Therefore, this factor does not weigh in favor of a Type I finding.

The third factor considers the degree to which all material terms to the agreement have been agreed upon and finalized.  In *Adjustrite*, the agreement at issue involved the purchase of proprietary software as well as two five-year employment contracts.  However, the agreement was silent as to the details concerning the proprietary transfer (i.e., "whether the transfer would include collateral rights, such as the copyrights to the software," and "whether the software had been sold or licensed to anyone else") and employment terms.  *Adjustrite*, 145 F.3d at 550.  The court, viewing these as two central components to the overall agreement, held that the absence of significant and material terms heavily disfavored a finding of a Type I agreement given the outstanding negotiations yet to be done.  *Id.* at 550-51.  Similarly, in *Brown*, the court also found that significant terms were missing from the agreement, and as such, this factor counseled against a Type I finding.  420 F.3d at 158.  There, the parties entered into a Memorandum of Understanding regarding the development of a luxury high-rise building on Jay Street in Brooklyn.  The writing contained terms and phrases that made it clear to the court that a significant amount of negotiating and future agreements still needed to be done.

13

As such, the court held that this factor also counseled against a Type I finding.  *Id.*  The result is no different on the instant facts.  First, the Settlement Term Sheet, in addition to explicitly contemplating a formal, long-form version of the settlement agreement, also contemplated the execution of four ancillary documents.  While Defendants acknowledge that the Settlement Term Sheet provided some agreed-to terms for those four documents, they also rightly point out that significant details were missing, such as progress reports or accountability provisions or benchmarks.  Further, Plaintiff does not make any argument as to the immateriality of these ancillary documents, stating only that upon execution of the Warrant Agreement, Plaintiff "complet[ed] the parties' agreement to all material terms in the Settlement Term Sheet."  (ECF No. 90 at 13.)  As such, there are significant material terms left to be negotiated relative to what has been provided for in the Settlement Term Sheet, and therefore, this factor also counsels against a Type I finding.

Finally, the fourth factor looks to whether the given agreement is of the type that is usually reduced to a formal writing.  "New York courts have recognized that the 'complexity and duration of [an] alleged agreement' is particularly significant in determining whether it must be reduced to formal writing in order to be fully enforceable."  *Brown*, 420 F.3d at 153 (quoting *Warwick Assocs. v. FAI Ins. Ltd.*, 713 N.Y.S.2d 178, 178 (2000)).  In *Adjustrite*, the deal at issue was valued at roughly $1 million, involved the transferring of intellectual property, and provided for two five-year employment contracts.  145 F.3d at 551.  This led the court there to find that such an agreement was sufficiently complex and spanned a long enough time period that there was an expectation it would be reduced to writing.  *Id.*  This counseled against a Type I finding.  In *Brown*, the Jay Street development Memorandum of Understanding entered into

by the parties was viewed by the court as "a project of enormous complexity" spanning

decades.  420 F.3d at 155-56.  This, too, counseled against a Type I finding.  The instant contract

is also of the type that, given its complexities, would be expected to be reduced to a formal

writing.  The Settlement Term Sheet contemplated more than a decade of contractual

relationship between the parties, the transfer of intellectual property, and a total value

exceeding $1 million.  An  agreement of this complexity and duration typically is memorialized

in a formally executed contract.  Given the absence of such, this factor also counsels against a

Type I agreement.

Therefore, all four factors counsel against holding the Settlement Term Sheet out as a

Type I preliminary agreement that binds the parties to the ultimate terms.  Accordingly, the

Settlement Term Sheet is not a Type I preliminary agreement.

### b.  *Type II Preliminary Agreements*

Having determined that the Settlement Term Sheet is neither a contract in its own right

nor a Type I preliminary agreement, I now turn to whether the Settlement Term Sheet is a Type

II agreement.  "The essence of a Type II preliminary agreement is that it creates an 'obligation

to negotiate the open issues in good faith in an attempt to reach the [ultimate contractual

objective] within the agreed framework.'"  *Brown*, 420 F.3d at 157 (quoting *Tribune*, 670 F.

Supp. at 498 (S.D.N.Y. 1987) (seminal case in which Judge Leval recognized Type I and II

preliminary agreements).  Courts use the following five factors, which have significant overlap

to the Type I factors, in assessing whether an agreement is a Type II preliminary agreement:

> (1) whether the intent to be bound is revealed by the language of the
> agreement;
> (2) the context of the negotiations;
> (3) the existence of open terms;

(4) partial performance; and
(5) the necessity of putting the agreement in final form, as indicated by the customary form of such transactions.

*Id.* at 157 (citing *Arcadian*, 884 F.2d at 72).  Despite the facial overlap between the four Type I factors and the above Type II factors, the Type II considerations "have a somewhat different significance where . . . the nature of the contract alleged is that it commits the parties in good faith to negotiate the open terms."  *Tribune*, 670 F. Supp. at 499; *see also Brown*, 420 F.3d at 157 (citing *Tribune*).  Because a Type II agreement bears a concomitant duty to continue negotiating in good faith, "the language of the agreement, its contents and omissions, and the context in which it was negotiated and signed, may lead to different conclusions" than those same factors being applied in the Type I context that assesses whether the parties intended to be bound by the ultimate terms.  *Brown*, 420 F.3d at 157.

Applying the first factor, the language of the Settlement Term Sheet reveals a clear and definitive intent by the parties to enter into a term sheet that would facilitate the contemplated transaction.  For example, the first page of the Settlement Term Sheet indicates that the "final documentation regarding" the settlement "shall be executed by May 31, 2019," which was just under two months away at the time.  (ECF No. 90-5.)  Another example can be found in Paragraph 4 of the Settlement Term Sheet, which provides that the "intended settlement shall only be trigged only [sic] upon the signing of the long form agreements that include" the four above-mentioned ancillary documents.  (ECF No. 90-5.)  While the future execution of these ancillary documents disfavored a Type I finding, the same facts favor a Type II finding, as the remaining items to be executed were clearly understood by the parties, and the parties even committed to a timeline.  Perhaps most notable under this factor is the handwritten loose-leaf

page appended to the end of the Settlement Term Sheets that bears a heading entitled "Next Steps," with two sub-points regarding actions that Defendants need to take, including providing the Warrant and Supply Agreements to Rembrandt.  (ECF No. 90-5.)  As discussed above, Defendants' counsel provided those documents to Plaintiff in the months following the second settlement conference.  This reveals Defendants' frame of mind with regard to the duty of good faith it assumed in continuing negotiations pursuant to the Settlement Term Sheet.

The second factor looks to the context of negotiations and is unique to the Type II analysis.  The following quote reveals the purpose of this inquiry:

> As the parties agree, at the time the MOU was signed, the Jay Street Project was subject to numerous contingencies that had the potential to dramatically affect planning, execution, and management.  It was in this context that the parties elected to negotiate a general framework within which they could proceed while preserving flexibility in the face of future uncertainty.  While it was possible in the abstract to negotiate a more definitive contract, using determinative methodologies to be applied to open issues, the context of the negotiations did not require derivation of such algorithms if the parties opted instead for a more open arrangement. The MOU is evidence of such an arrangement, and, as a Type II agreement, is consistent with the context of the negotiations.

*Brown*, 420 F.3d at 158.  Thus, the court in *Brown* determined that given the context and subject matter of the agreement—a complex and expensive real estate development in New York City—the parties intended to enter into a framework with which they could come to a formal agreement.  This is analogous to the objective evidence on the record in the instant case.  The subject matter of the Settlement Term Sheet is a settlement agreement over a litigation involving three patent infringement and various contractual (and quasi-contractual) claims.  It therefore makes sense that the parties first entered into a detailed framework before

executing the final settlement agreement.  The context of the negotiations support a finding of a Type II agreement.

The third factor, like the second, requires no new discussion of the facts, but where those same facts discussed in the Type I context disfavor a Type I finding, "where the existence of open terms creates a presumption against finding a binding contract as to the ultimate goal, these same omissions may actually support finding a binding Type II agreement." *Brown*, 420 F.3d at 158 (citing *Adjustrite*, 145 F.3d at 548 & *Tribune*, 670 F. Supp. at 499).  This is true here. The fact that the parties had negotiated some aspects, but not all, of the terms to be incorporated into the four ancillary documents, for example, reveals a mutual intent to continue negotiating the Settlement Term Sheet in good faith until a final and formal agreement had been reached.  Because I presided over the negotiations, I know that the parties had reached an understanding on a number of material terms and intended to finalize the terms of the ancillary documents so that a full and final agreement could be signed within a short time.

The fourth factor, which asks whether there has been partial performance of the obligations under the contract, is no different than the Type I analysis here.  No party has partially performed in any respect, so no intent to be bound by the terms or bound by a duty of good faith can be gleaned from any attempted performance.

The analysis for the final factor—the customary expectations as to whether one would expect the agreement to be formally finalized—is similar to the analysis of the final factor under Type I.  Here, the Settlement Term Sheet is a memorialization of complex and long-spanning terms of a principle or working agreement.  Thus, this factor favors a Type II finding.

As such, four of the five Type II factors favor a finding that the Settlement Term Sheet is a Type II preliminary agreement.  Therefore, I recommend the Court hold the Settlement Term Sheet Agreement to be a Type II preliminary agreement that conferred on all parties to it a duty to continue negotiating the agreement in good faith.  However, because a Type II preliminary agreement does not bind the parties to the terms or the ultimate contractual objective(s), while Plaintiff may separately pursue a breach of contract claim against Defendants, this holding does not entitle Plaintiff to enforce the terms of the Settlement Term Sheet because it is incomplete and contemplated other agreements.

As a final note, I do not address whether Plaintiff may be entitled to damages for a potential breach of the duty of good faith in this Report given that the main focus of the parties' briefing was on the enforceability of the term sheet.  A determination of this issue requires further briefing on those issues.  This Court has jurisdiction to entertain such a motion given a district court's inherent power to "enforce summarily, on motion, a settlement agreement reached in a case that *was pending before it.*"  *BCM Dev., LLC v. Oprandy, 490 F. App'x 409 (2d Cir. 2013)* (quoting *Meetings & Expositions Inc. v. Tandy Corp.*, 490 F.2d 714, 717 (2d Cir. 1974); *see also Bluelink Mktg. LLC v. Carney*, No. 16-cv-7151 (JLC), 2017 WL 4083602, at *4 (S.D.N.Y. Sept. 15, 2017) (determining that the court had the jurisdiction to enforce an alleged settlement agreement reached before it because the motion to enforce was made while the case was pending and not while it was closed or made after judgment).  Therefore, should this Report be adopted by the Court, and should Plaintiff wish to pursue damages for a breach of the Settlement Term Sheet (as Type II preliminary agreement), I recommend allowing Plaintiff to file a renewed motion to enforce the settlement agreement solely addressing

whether there was a breach of the Type II preliminary agreement, and if so, if there are recoverable damages.  In that event, I recommend requiring any motion to be filed within two weeks of the adoption of this Report, any opposition to be filed two weeks after the moving papers, and not allowing a reply brief.

**CONCLUSION**

In light of the foregoing, I respectfully recommend finding that the Settlement Term Sheet is a Type II preliminary agreement, and is neither an enforceable contract nor a Type I preliminary agreement that binds the parties to perform the terms of the Settlement Term Sheet.  However, I recommend further briefing on breach and damages of the Settlement Term Sheet if the Court adopts my recommended finding that it is a Type II agreement.


Dated: November 4, 2020
      New York, New York

                     Respectfully,

                     _____
                     KATHARINE H. PARKER
                     United States Magistrate Judge

**NOTICE**

**The Parties shall have fourteen days from the service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1) and Rule 72(b) of the Federal Rules of Civil Procedure.  *See also* Fed. R. Civ. P. 6(a), (d) (adding three additional days only when service is made under Fed. R. Civ. P. 5(b)(2)(C) (mail), (D) (leaving with the clerk), or (F) (other means consented to by the parties).**

**If Plaintiff file written objections to this Report and Recommendation, the Defendants may respond to Plaintiffs' objections within fourteen days after being served with a copy.  Fed. R. Civ. P. 72(b)(2).  Alternatively, if Defendants files written objections, Plaintiff may respond to such objections within fourteen days after being served with a copy.  Fed. R. Civ. P. 72(b)(2); *see also* Fed. R. Civ. P. 6(a), (d).  Such objections shall be filed with the Clerk of the Court, with courtesy copies delivered to the chambers of the Honorable Ronnie Abrams at the United States Courthouse, 500 Pearl Street, New York, New York 10007, and to any opposing parties.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b).  Any requests for an extension of time for filing objections must be addressed to Judge Abrams.  The failure to file these timely objections will result in a waiver of those objections for purposes of appeal.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(d), 72(b); *Thomas v. Arn*, 474 U.S. 140 (1985).**